**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| DANA MCGEE, | : |
| | : Civil Action No. 17-2746(RMB) |
|             Petitioner | : |
| | : |
|      v. | : **OPINION** |
| | : |
| STEPHEN JOHNSON, *et al.*, | : |
| | : |
|           Respondents. | : |
| | : |

**BUMB**, District Judge

    This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Pet., ECF No. 1) filed by Petitioner Dana McGee ("Petitioner"), an inmate confined in New Jersey State Prison in Trenton, New Jersey. Respondents filed an answer opposing habeas relief (Answer, ECF No. 17), and Petitioner filed a traverse.(Traverse, ECF No. 26.) Pursuant to Federal Rule of Civil Procedure 78, the Court will determine the claims presented in the petition on the written submissions of the parties.

I. BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal. See D.M., 2010 WL 2868503.

> Between August 2001 and October 30, 2002, D.L. was sexually abused by defendant, a live-in boyfriend of her mother, C.W. During the summer of 2001, when D.L. was eight years old and about to start third grade, D.L. lived in an apartment with her three-year-old sister, C.W., and defendant. The sexual abuse usually occurred in D.L.'s bedroom before she went to school.

> On the evening of October 30, 2002, when D.L. was nine years old, she told her mother that defendant touched her sexually that morning. That night, C.W., D.L. and her sister left the apartment and stayed in a hotel.

> The next morning, C.W. took D.L. to a family doctor. The doctor referred the matter to the Division of Youth and Family Services (DYFS), and a caseworker requested that D.L. be examined by Dr. Martin A. Finkel, D.O. Dr. Finkel is a pediatrician employed by the University of Medicine and Dentistry of New Jersey. He is a professor of pediatrics and medical director of the Child Abuse Research Education and Service (CARES) Institute. The CARES Institute is a diagnostic and treatment center for children who are suspected of having experienced abuse. At trial, Dr. Finkel was qualified as an expert in the field of "pediatrics and in the diagnosis and treatment of child sexual abuse."

> On October 31, 2002, Dr. Finkel examined D.L. Before the examination, Dr. Finkel obtained a separate medical history from C.W. and then from D.L. to avoid one from influencing the other.

Dr. Finkel explained that a diagnosis involving child sexual abuse is made the same way a doctor renders a diagnosis of any medical disorder. The doctor takes a history and then performs an examination. He said that "when [physicians] evaluate children [when] there's a concern for whether they've experienced something of a sexually inappropriate nature, the medical history is really [a] key and paramount component...." In taking a child's history, Dr. Finkel first obtains information from an accompanying adult then the child. A complete medical history from birth to the present exam is obtained from the adult. He testified:

> When there has been a concern that a child experiences something of a sexually inappropriate nature, [physicians] particularly focus on the gastrointestinal and genital urinary systems because those are[,] in a sense [,] the target organs[,] and so I ask a very detailed series of questions about [those systems. I]f I'm asking about [the] genital urinary system, I'll ask questions [such as: H]as the child ever had a kidney or bladder infection, a vaginal discharge, vaginal odor, [or] vaginal bleeding[? H]ave they ever had any accidental injuries[? H]ave they ever had discomfort with urination[? H]ave they ever had blood in their urine[? D]o they use bubble baths, [and] if so[,] have they ever complained of discomfort with that[? H]ave they ever had their private parts examined other than routine health care?

He noted that a small percentage of children require follow-up medical care for sexually transmitted diseases. The follow-up care includes re-culturing and blood tests.

During D.L.'s medical exam, C.W. was present. On the physical examination, Dr. Finkel reported:

> Examination of genitalia was completed in the lithotomy position with use of gross macroscopic and colposcopic visualization at [four, six, and ten] magnification with white and green light. The labia majora and minora and clitoral hood are well formed without findings of trauma. With labial separation and traction, it is possible to visualize a slight estrogen affect to the hymenal tissues. There was an annular shaped configuration to the orifice. There are no interruptions in the integrity of the hymenal membrane. There are no acute or chronic signs of trauma. Examination of the external anal verge tissues revealed a symmetric rugal pattern, normal response to traction, normal symmetric tone[,] and no acute or chronic signs of trauma.

As part of the history, D.L. told Dr. Finkel that the touching was "both like wiping and inside" in the adult sense of the word. D.L. described to Dr. Finkel that defendant "pulled [her] over and put [her] on top of him." She said that this happened "in [her] room." D.L. told Dr. Finkel that this happened right before school. D.L. stated that defendant touched her private parts, which she referred to as her "pee pee and butt," with his finger. D.L. said that she was wearing her pajamas at the time that defendant touched her under her clothing, and that "it was hurting [her] inside."

Using a plastic model of the female genitalia, D.L. showed Dr. Finkel what defendant did. D.L. told him that defendant rubbed her vagina, and that it "hurt after when he

stopped and[, she] went to the bathroom." She told the doctor that she felt "stinging" when she urinated. She told Dr. Finkel that defendant touched her with his "private" which was "long and nasty." She said that defendant would start "shaking it." She told the doctor that afterwards she had to clean her private because it was "creamy and wet." D.L. told the doctor that defendant would watch "nasty movies with two girls."

Dr. Finkel examined her for sexually transmitted diseases, but all cultures were negative. He said that D.L.'s history was "augmented by symptom[-]specific complaints referable to specific events." According to the doctor, the touching "caused some local irritation or trauma and [D.L.] then described that after [defendant] stopped ... it hurt." Specifically, it "stung" when D.L. went to the bathroom. Dr. Finkel explained that this discomfort when urinating is known as dysuria.

Dr. Finkel concluded that D.L. "had a symptom related to a specific event that reflect[ed] trauma to those tissues in the process of rubbing." He explained that "superficial [irritation] could easily heal within [twenty-four] hours." Dr. Finkel opined, within a reasonable medical certainty, that D.L. experienced trauma to the structures of the vaginal vestibule. His diagnosis was not only based upon the history provided by D.L. but also upon his particular knowledge of dysuria, and the sexually explicit details that one would not expect a nine-year-old to know.

Dr. Finkel's objective findings were consistent with penetration into the vaginal vestibule. Upon clinical examination he determined that "the degree of inside was not past the hymenal membrane, [and] that it was limited to [the] structure known as the vaginal vestibule." He explained that the touching was between the labia with a finger and a penis and the penetration was "[w]ith a

finger and ... a penis into the structures of the vaginal vestibule."

Through the history obtained from C.W., Dr. Finkle learned that D .L. had no past medical history of dysuria or discomfort with urination, no urinary tract infections, and no genital complaints. He found that the complaint of dysuria was "something that was specifically related to this specific event."

The doctor opined that D.L. experienced inappropriate genital touching and genital contact. He said,

> In the context of that genital touching she experienced trauma to the tissues around the urethra that result[ed] in a symptom of dysuria. She also had the potential for contracting a sexually transmitted disease from a history that suggests there was contact with potentially infected genital secretions.

On November 1, 2002, D.L. was interviewed by Detective Frank Troso, and she gave a videotaped statement. This was her first contact with law enforcement. D.L's description to the detective of what defendant did was similar to what she told Dr. Finkel. She told Troso that defendant would enter the bedroom, pull down her pajamas and "do stuff to [her]." Defendant would "take off his clothes[,] and he would take his private part and put it inside [D.L .'s] private part." She described his private part as his penis and how defendant "put it in [her] private part." She stated, "every time it happened, that's mostly what he did." She said that defendant touched her private part with his hand, "but that didn't happen as much as the other thing happened."

"He would take his penis and shove it into my bottom," she also said. He would go inside her bottom and rub his penis on her bottom.

Defendant put D.L.'s hand on his penis. She said that when these things happened, his penis was hard. She said that "white[,] foamy" stuff would come out of his penis, and it would go on her hand, on her bottom, and on her private part. She said that these things happened more than once.

D.L. told Troso that defendant put his penis in her vagina on at least three occasions, placed his penis inside her buttocks at least twice, and digitally penetrated her. Troso testified that D.L. "described very, very graphic and detailed accounts of what happened" between her and defendant.

On April 24, 2003, defendant was indicted. On May 4, 2004, the trial judge granted defendant's motion to dismiss the indictment based on the State's failure to present exculpatory evidence. The judge found that the State's failure was not an intentional subversion, and permitted the State to re-present the case to the grand jury.

On May 6, 2004, the State re-presented the matter to the grand jury. This time, the State offered additional evidence that there were no acute or chronic signs of trauma to D.L.'s vagina or anus. The State elicited the following testimony from Detective Troso:

Q: Now did you ever receive a report from Dr. Finkel?
A: Yes, I did.
Q: And Dr. Finkel, as you described him[,] is essentially ... a pediatric gynecologist?
A: Yes.
Q: You reviewed that report after you received it?
A: Yes, I did.
Q: And you've reviewed it in preparation for ... today's presentation?
A: Yes.
Q: Dr. Finkel had two areas which are of import ... to your case. The first area was whether or not there were physical ... findings

concerning trauma or physical abuse to either
the vagina or anus of [D.L.]?
A: Correct.

The assistant prosecutor asked Troso to read
Dr. Finkel's diagnostic assessment. He read
the following:

> The historical information that ...
> has been provided clearly details
> this young girl experiencing a
> variety of age inappropriate sexual
> interactions that she explained in
> detail to [Dr. Finkel,] which
> involved genital fondling with
> penetration into the structures of
> the vaginal vestibule and genital[-
> ]to [-]genital contact with
> placement between the labia and
> rubbing into the structures of the
> vagina[l] vestibule. As a result of
> the genital fondling, she
> complained of discomfort following
> the contact in the form of dysuria.
> This reflects trauma to the
> structures around the urethra. The
> only way that she could know this
> particular symptom [temporally]
> related to this event is by having
> experienced such. This confirms
> with medical certainty that she
> experienced trauma to the
> structures of the vaginal
> vestibule. Those injuries were
> superficial and have since healed
> without residual[s] as would be
> anticipated.

After this presentation, defendant was
indicted on May 6, 2004, and charged with
three counts of first-degree aggravated sexual
assault, *N.J.S.A.* 2C:14-2a(1) (Counts One,
Three and Five); seven counts of second-degree
endangering the welfare of a child, *N.J.S.A.*
2C:24-4a (Counts Two, Four, Six, Eight, Ten,
Twelve, and Fourteen); and four counts of

second-degree sexual assault, *N.J.S.A.* 2C:14-2b (Counts Seven, Nine, Eleven and Thirteen).

On April 7, 2005, the judge heard oral argument on defendant's second motion to dismiss the new indictment and defendant's motion to bar the testimony of Dr. Finkel. Defendant argued that the State failed to present sections of Dr. Finkel's report indicating that there was no finding of trauma surrounding the victim's labia and clitoral hood, that the hymen was intact, and that the victim's anal tissue was normal.

At the conclusion of oral argument, the trial judge denied defendant's second motion to dismiss the indictment having found that the State presented the pertinent, relevant parts of the victim's history, physical examination, and diagnostic assessment. The judge deferred a ruling on defendant's motion to bar Dr. Finkel's testimony until a Rule 104(a) hearing was conducted.

On June 7, 2005, we denied defendant's motion for leave to appeal the April 7, 2005 order.

On July 26, 2005, the trial judge conducted the Rule 104(a) hearing to determine the admissibility of Dr. Finkel's testimony. The judge concluded that Dr. Finkel's testimony was admissible. He determined that Dr. Finkel could testify as to what D.L. told him under N.J.R.E. 803(c)(4), which permits the introduction of hearsay statements offered for the purposes of medical treatment or diagnosis. The judge concluded that "the medical treatment purpose of the examination conducted by Dr. Finkle was evident."

Jury selection began, and on May 23, 2006, defendant requested to represent himself at trial. The judge granted that request and his further request for additional time, discharged the jury, and rescheduled the trial.

On January 9, 2007, the judge revisited defendant's desire to proceed *pro se* and found that defendant's waiver of counsel was knowing and voluntary.

Defendant was tried from January 10, 2007, through January 18, 2007. D.L. testified at trial. By using her fingers, she described to the jury what defendant did to her. She said:

> If this is my private part[,] and my private part has two like flaps on it, he would take his middle finger[,] and he'[d] go like this, like that[,] and he'[d] stroke it up and down like this.

She showed the jury how defendant moved his finger from left to right, and how his finger went inside the two "flaps." She said that he did the same thing with his penis that he did with his hand. Defendant rubbed his penis on the "flaps."

(Id. at *1-5.)

II. PROCEDURAL HISTORY

Following a jury trial, on January 18, 2007, Petitioner was convicted of three counts of aggravated sexual assault in violation of N.J. Stat. Ann. § 2C:14-2a(1), six counts of second-degree endangering the welfare of a child in violation N.J. Stat. Ann. § 2C:24-4a, and three counts of second-degree sexual assault in violation of N.J. Stat. Ann. § 2C:14-2b in the Superior Court of New Jersey, Law Division, Burlington County. State v. D.M., Indictment No. 04-05-0483, 2010 WL 2868503 *4-5 (N.J. Super. Ct. July 21, 2010). Petitioner was sentenced to an aggregate sixty-

year sentence subject to the No Early Release Act ("NERA"). Id. at 1.

Petitioner appealed. (Answer, Ex. Ra5, ECF No. 17-8.) The Appellate Division affirmed the conviction and sentence on July 21, 2010. See D.M., 2010 WL 2868503. Petitioner then filed a petition for certification in the New Jersey Supreme Court. (Answer, Ex. Ra9, ECF No. 17-12.) The New Jersey Supreme Court denied the petition on October 21, 2010. State v. D.M., 6 A.3d 443 (N.J. 2010).

Petitioner filed a *pro se* post-conviction relief ("PCR") petition in January 2011. (Answer, Ex. Ra12, ECF No. 17-15.) Petitioner's attorney filed a letter brief in support of the petition on his behalf in March 2012. (Id., Ex. Ra13, ECF No. 17-16.) Oral argument was held before the Honorable Michael J. Haas on June 21, 2012. (Id., Ex. Ra15, ECF No. 17-18.) On June 22, 2012, the PCR court denied Petitioner's request for relief without a hearing. (Id.)

Petitioner appealed the PCR court's decision. (Answer, Ex. Ra18, ECF No. 17-21.) On May 5, 2015, the Appellate Division affirmed the PCR Court. State v. D.L.M., A-0831-12T4, 2015 WL 1980045 (N.J. Super. Ct. App. Div. May 5, 2015). Petitioner filed a petition for certification with the New Jersey Supreme Court, which was denied on September 12, 2016. State v. D.L.M., 151 A.3d 81 (N.J. 2016).

Petitioner filed a second PCR petition on November 16, 2016, seeking DNA testing pursuant to N.J. Stat. Ann. § 2A:84A-32a, and arguing that "stand-by counsel should have subpoenaed Dr. Sheehan to see i[f] she took vaginal cultures or swabs from the victim." (PCR Court Order Denying Petitioner's Second Petition for Post-Conviction Relief and Motion for DNA Testing, Ex. Ra24, ECF No. 11-27 at 1.) The PCR Court denied his second PCR petition on March 23, 2017, finding that McGee raised essentially the same arguments as in his first PCR motion. (Id. at 2.) McGee then filed the present habeas petition on April 13, 2017. (Pet., ECF No. 1.)

III. DISCUSSION

A. Standard of Review

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. Williams, 529 U.S. at 412. An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S.Ct. 1855, 1862 (2010)).

B.   Analysis

1.   Ground One

a.   The Parties' Arguments

In Petitioner's first ground for relief, he claims that he was prohibited from exercising his right of self-representation in violation of the Sixth Amendment. (Pet., ECF No. 1 at 5.) Petitioner, who was assisted by standby counsel Timothy Reilly, Esq., alleges that he was prohibited from presenting a defense expert witness, Dr. Kathleen Brown. (Id. at 2.)

Respondents contend that while Petitioner's waiver of his right to counsel served as a bar to future claims of ineffective assistance, he has nonetheless failed to demonstrate that standby counsel was ineffective. (Answer, ECF No. 17 at 41-49.) Respondents further contend that any claims of purported trial court errors while attempting to locate and learn of what Dr. Brown's testimony would entail, are meritless. (Id. at 48-49.)

### b. State Court's opinion

The Court notes that while Petitioner raised this claim within the context of his right of self-representation in his counseled PCR brief, he did not appeal the PCR court's denial of this particular claim. Petitioner unsuccessfully raised this claim as an ineffective assistance of appellate counsel claim on appeal of the PCR decision. D.L.M., 2015 WL 1980045 at *3. While this claim is unexhausted, it can nonetheless be denied on the merits. See Granberry v. Greer, 481 U.S. 129, 131, 135 (1987) (noting that the exhaustion requirement is not a jurisdictional requirement to the exercise of habeas corpus jurisdiction over the merits of a state prisoner's claims and a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim.").

To the extent that the PCR Court ruled on this particular claim, it held that Petitioner "was free to argue any abuse of

discretion on Judge Almeida's part to the Appellate Division on direct appeal." (Answer, Ex. Ra15, ECF No. 17-18 at 30.)

c.    <u>Analysis</u>

The right to self-representation is guaranteed by the Sixth Amendment to the United States Constitution as well as the New Jersey Constitution. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. The clearly established federal law for claims alleging denial of the right to self-representation was articulated by the United States Supreme Court in <u>Faretta v. California</u>, 422 U.S. 806 (1975). This right is afforded to a defendant who voluntarily, knowingly, and intelligently chooses to do so, and the state may not constitutionally force a lawyer upon him. <u>Id.</u> at 834-35. <u>Faretta</u> and its progeny of cases provide that a defendant must unequivocally assert his right to self-representation in a timely manner and the trial court must then conduct a colloquy with the defendant to determine that the waiver of counsel is knowing and voluntary. <u>Buhl v. Cooksey</u>, 233 F.3d 783, 791 (3d Cir. 2000).

At the start of the defense's case-in-chief, the court twice permitted Petitioner and his standby counsel to use court facilities to call Kathleen Brown, PhD., a nurse who reviewed the medical examiner's report. (Answer, Rta Nos. 12-13, ECF Nos. 17-40 at 4.) Dr. Brown, who previously advised Mr. Reilly that she would not serve as a witness and further that her testimony would not be favorable to the defense's case, did not respond to both

15

attempts to reach her that day. (Id.) The Court subsequently held a lengthy discussion with the parties about the issue and Petitioner insisted that he needed to speak with Dr. Brown. (Id. at 5.) The court arranged for Petitioner to be able to receive calls at the jail where he was detained in the event that Dr. Brown returned his calls that evening. (Id. at 6.) The court dismissed the jury with the hopes that the case could resume the following day. (Id. at 9.)

The next morning, the court learned that the defense had an approximately fifteen to eighteen-minute telephone conversation with Dr. Brown. (Id., ECF No. 17-41 at 3.) Mr. Reilly proffered to the court that Dr. Brown's testimony would not be helpful to the defense and that Dr. Brown indicated she would not be able to testify that day. (Id. at 4.) Petitioner urged the court to speak with Dr. Brown about the issue of her arranging her travel to court and also explained at length, what he expected Dr. Brown's testimony to entail. (Id. at 4-8.) The trial court then gave Petitioner an additional opportunity to attempt to reach Dr. Brown by telephone. (Id. at 9.) Petitioner re-appeared before the court and indicated that Dr. Brown would not be able to testify that day. (Id.) However, he repeatedly evaded the judge's question when asked whether Dr. Brown's testimony would be helpful to his case. (Id.)

The trial court then swiftly ordered the parties into chambers for an on-the-record telephone call to Dr. Brown. (Id. at 10.) The trial judge and Dr. Brown had a brief discussion about her favorable opinion of the medical examiner's report as well as the fact that she previously relayed this information to Petitioner and his standby counsel. (Id. at 10-11.) Near the end of the judge's conversation with Dr. Brown, Petitioner attempted to ask her a follow-up question which the judge quickly prohibited. (Id.)

Petitioner nonetheless argues that he "was forced to end presenting his defense at this point." (Pet., ECF No. 1 at 6.)

Here, while Petitioner appears to disagree with Dr. Brown's professional opinion and her subsequent decision to not serve as a defense witness, he has not demonstrated how the trial court impinged on his right to represent himself. The record is clear that Petitioner represented himself and had the assistance of standby counsel throughout the course of the trial. Further, the record reflects that the trial court gave Petitioner and standby counsel numerous opportunities to contact Dr. Brown after the trial had commenced; many of those times providing them with exclusive use of court facilities. The principles set forth in Faretta, namely that his waiver of counsel was knowing, intelligent and voluntary, do not bear on Petitioner's instant claim. Therefore, Petitioner has not established a valid Faretta violation. Ground One of the petition is denied.

2. <u>Ground Two</u>

a. <u>The Parties' Arguments</u>

In Ground Two of his petition, Petitioner contends his "pre-trial" counsel provided ineffective assistance in violation of the Sixth Amendment by failing to thoroughly investigate the case "and/or" communicate the status of the case to Petitioner. (Pet., ECF No. 1 at 7.) More specifically, Petitioner argues that counsel failed to request deoxyribonucleic acid ("DNA") testing on swabs taken from the victim and failed to request the report that concluded Petitioner's DNA was on cigarette butts retrieved from law enforcement during Petitioner's post-arrest interview. (<u>Id.</u>) Petitioner submits that DNA testing of the cultures taken from the victim would have resulted in his acquittal. (<u>Id.</u>) He further contends that counsel's pre-trial dereliction prompted him to represent himself for the balance of his case including the entirety of the trial. (<u>Id.</u>)

Respondents contend the Appellate Division reasonably applied <u>Strickland</u> by finding counsel was not ineffective for failing to pursue this information. (Answer, ECF No. 17 at 51-55.) Respondents submit that the record is silent about any physical evidence being taken from Petitioner either at his residence or anywhere else. (<u>Id.</u> at 52.) Respondents further submit that the record is also void of any evidence that DNA was taken from the victim. (<u>Id.</u> at 52-53.) Moreover, Respondents point out that the victim's

allegations involved conduct that spanned over a significant period of time, specifically one year and two-months. (Id. at 53.)

### b.   The State Court's Decision

On habeas review, the district court must review the last reasoned state court decision on each claim. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The highest state court decision on Ground Two is the Appellate Division's review of the PCR Court's decision. The Appellate Division addressed this claim in part as follows:

> Here, there is no evidence showing that any DNA samples were taken from defendant's cigarette butts, or any report was generated concerning defendant's DNA. Moreover, the record indicates that no DNA evidence was ever recovered from the victim. Indeed, Dr. Finkel testified at trial that he took vaginal cultures from the victim but he never said he swabbed the victim for DNA evidence. Thus, counsel was not ineffective for failing to obtain discovery regarding evidence that did not exist, and appellate counsel was not deficient in failing to raise this issue on appeal.

D.L.M., 2015 WL 1980045 at *4.

### c.   Analysis

The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requirement

involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. Second, the defendant must show that he was prejudiced by the deficient performance. Id. This requires showing that counsel's errors deprived the defendant of a fair trial. Id. Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." Id. at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape what the Strickland court referred to as the "distorting effects of hindsight." Id.

The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694. When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard." Grant v.

20

Lockett, 709 F.3d 224, 232 (3d Cir. 2013) (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)).

A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the Strickland standard itself." Id. Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." Id. (quoting Cullen v. Pinholster, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under Strickland, "through the deferential lens of § 2254(d)." Id. (internal quotation marks and citations omitted). "With respect to the sequence of the two prongs, the Strickland Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" Rainey v. Varner, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting Strickland, 466 U.S. at 697)).

At Petitioner's trial, Dr. Finkel testified about the examination he conducted on the victim the day after she reported the offense.[1] (Answer, Ex. Rta10, ECF No. 17-38.) He testified that

---

[1] The victim testified that she reported the abuse by Petitioner to her mother at an earlier date, but the mother did not take any

after conducting an interview with the victim, he "evaluated her for sexually transmitted diseases using cultures." (Id. at 24.) Further, the victim testified that although it was her October 30, 2002 report of the abuse that prompted her mother to notify authorities, Petitioner's conduct spanned over a prolonged period of time. (Answer, Ex. Rta9, ECF No. 17-37 at 17-21.)

While the Court is aware that the victim alleged that Petitioner's sexual abuse occurred up until the day before she was seen by Dr. Finkel, the Respondents argue that the charging documents alleged that the conduct occurred over a fourteen-month timespan. (Answer, ECF No. 17-53.) Further, the victim's own trial testimony and statements to Dr. Finkel reflect that Petitioner did not exclusively penetrate her with his penis, but also digitally penetrated her. (Answer, Ex. Rta9, ECF No. 17-37 at 18-19, Ex. Rta10, ECF No. 17-37 at 27.) In context, it makes sense that counsel did not pursue the issue of requesting any DNA analysis of vaginal cultures taken from the victim because the state's case did not rely on the exclusive theory that Petitioner penetrated the victim with his penis on October 31, 2002.

The record does not reflect that any of the biological matter taken from the victim was ever submitted for DNA analysis because that did not appear to be the doctor's reason for taking the

---

subsequent action involving reporting it to authorities. (Answer, Ex. Rta9, ECF No. 17-31 at 17.)

cultures from the victim. Nor for that matter, did the state's medical witness testify that the cultures taken from the victim could be subjected to DNA testing. See Marshall v. Hendricks, 307 F.3d 36, 85 (3d Cir. 2009) ("The deference accorded to counsel's reasonable strategic decisions can be seen in numerous United States Supreme Court rulings following on the heels of Strickland.") Moreover, the record is silent about law enforcement procuring any cigarette butts or any other items purportedly having Petitioner's DNA.

Therefore, Petitioner has not established that the state court's denial of this claim was not an unreasonable application of clearly established federal law. Ground Two of the petition is denied.

### 3. Ground Three

#### a. The Parties' Arguments

In Ground Three, Petitioner contends he was denied his right to effective assistance of standby counsel because of his failure to subpoena Dr. Kathleen Brown and Dr. Sheenan to testify for the defense. (Pet., ECF No. 1 at 8-9.) Petitioner alleges that Dr. Sheenan was the first physician to examine the victim after she reported the assault. (Id.) He also provides, "[a]s part of the examination, Dr. Sheenan would have conducted a vaginal examination and taken vaginal swabs. These swabs would have contained bodily fluids, which would have contained important DNA

evidence." (Id.) Petitioner argues that this DNA evidence would have proven to be exculpatory evidence. (Id.) Further, in his traverse Petitioner provides that his basis for knowing about Dr. Sheenan's examination of the victim is from handwritten notes of an examination of the victim which Petitioner provides are Dr. Sheenan's notes.[2] (Traverse, ECF No. 26 at 40.)

Respondents assert that the Appellate Division properly resolved Petitioner's claim as Petitioner has not demonstrated that standby counsel was ineffective for not compelling Dr. Brown's testimony, as she was not able to provide testimony that was helpful to his case. (Answer, ECF No. 17 at 50-51.) Further, Respondents submit that Petitioner has failed to demonstrate how he was prejudiced by counsel's failure to subpoena Dr. Sheenan. (Id. at 50.)

b.   The State Court Decision

On appeal of the PCR denial, the Appellate Division addressed this claim as follows:

---

[2] Petitioner also provides that despite Respondents' argument that they are not aware of Dr. Sheenan's role in the matter, she was listed as a state's witness on the trial witness list. He provides that although the witness list was not provided to the state court, he can provide it to this Court upon request. (Traverse, ECF No. 26 at 40.) In a subsequent filing, Petitioner provides a purported "Prosecutor's Office Witness List" that lists a "Dr. C. Sheenan." (ECF No. 27 at 5.) See Cullen v. Pinholster, 563 U.S. 170, 181 (2011)(held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.")

Defendant also argues that standby counsel erred by failing to subpoena certain witnesses for trial, specifically Dr. Brown and a "Dr. Sheenan." The PCR court correctly found that this claim was without merit. The court wrote:

> Dr. Brown was unable to testify in a way that was beneficial to defendant, and both Dr. Brown and standby counsel agreed that her testimony could be detrimental to defendant's case. Because defendant disagreed with standby counsel about this issue, [the trial court] took the extra step of finding out exactly what Dr. Brown's potential testimony would be. After [the court] was satisfied that defendant had misstated Dr. Brown's position regarding testifying at his trial, [the court] determined that [it] was not going to order Dr. Brown to testify. Given these circumstances, standby counsel's failure to subpoena Dr. Brown to give testimony damaging to defendant was not below an objectively reasonable standard of representation, nor has defendant argued that he was prejudiced in any way by Dr. Brown's absence at trial. As to "Dr. Sheenan," it is unclear from the record who "Dr. Sheenan" is, and defendant has failed to articulate any reason standby counsel should have subpoenaed [this witness] and he has failed to demonstrate that he was prejudiced by standby counsel's failure to do so.

The record fully supports the PCR court's determination regarding this claim.

D.L.M., 2015 WL 1980045 at *4.

c.    Analysis

The Court need not reiterate the ineffective assistance of counsel standard applied in such claims. See supra, Section 3, B 2 c. In addition to the standard set by Strickland and its progeny, the United States Court of Appeals for the Third Circuit has provided that counsel is not ineffective just because he does not act in accordance with the defendant's wishes. See Diggs v. Owens, 833 F.2d 439, 445-46 (3d. Cir. 1987). Moreover, the petitioner must demonstrate how a witness's testimony would have been favorable to his defense. See United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989).

First, with respect to Dr. Kathleen Brown, this Court considered the factual context within which Dr. Brown was not called to serve as a defense witness, in its disposition of Ground One of the instant petition. See supra, Section 3, B 1 c. Notably, in addition to standby counsel's multiple proffers to the trial court about Dr. Brown's potentially harmful testimony if she were called to testify, the record reflects that the trial court made an on-the-record inquiry of Dr. Brown via telephone. (Answer, Ex. Rta No. 13, ECF No. 17-41 at 10-11.) Dr. Brown explained to the trial court that her testimony would potentially work against Petitioner's defense because she concurred with Dr. Finkel's report.

Next, with respect to Dr. Cindy Sheenan, the Court has reviewed an exhibit which Petitioner submits are Dr. Sheenan's handwritten notes.[3] (Answer, Ex. Ra17, ECF. No 17-20 at 40.) Dr. Sheenan's name does not appear to be anywhere on the document. While the document does indicate that the victim was interviewed and examined by a professional on October 31, 2002, after reporting recent sexual abuse, the document's author is unknown. (Id.)

The Appellate Division reasonably concluded that trial standby counsel was not ineffective. Other than Petitioner's uncorroborated assertion of Dr. Sheenan's existence, the record does not reflect what role she played in the case. Even if this Court were to accept that she did in fact meet with and examine the victim shortly after the offense was reported, Petitioner has not demonstrated how her testimony would have been helpful. He assumes, without any factual basis, that she "would have conducted a vaginal examination and taken vaginal swabs. These swabs would have contained bodily fluids, which would have contained important DNA evidence." (ECF No. 1 at 9.) Nonetheless, he has not established how the results of the examination would have undermined the state's case against him; particularly in light of

_____

[3] These notes were attached as an exhibit to Petitioner's pro se appeal of the PCR denial. (Answer, Ex. Ra17, ECF. No 17-20 at 40.) The record does not reflect that this exhibit was provided to the PCR Court. See Cullen, 563 U.S. 170, 181 (2011).

the fact that the victim alleged that the abuse occurred over a prolonged period of time. See Strickland, 466 U.S. at 694.

Therefore, the Appellate Division's determination was not contrary to or an unreasonable application of clearly established Supreme Court precedent. Ground Three of the petition is denied.

### 4.   Ground Four

#### a.   The Parties' Arguments

Petitioner's fourth ground for relief is that his appellate counsel was ineffective for failing to raise the following issues on direct appeal: first, that the trial court abused its discretion by impinging on his right to self-representation; second that pre-trial counsel was ineffective for failing to subpoena an expert witness. (Pet., ECF No. 1 at 10.) Petitioner does not provide any supporting facts but it appears that he is alleging ineffective assistance of appellate counsel for failing to raise Grounds One and Three of the instant habeas petition.

Respondents assert the Appellate Division reasonably denied this claim because neither counsel's supposed failure to call a witness or the trial court's decision to inquire directly about the favorability of Dr. Brown's testimony, violated Petitioner's constitutional rights.(Answer, ECF No. 17 at 62.)

#### b.   The State Court Decision

On PCR appeal, the Appellate Division addressed this claim as follows:

Defendant further argues that his appellate
counsel rendered ineffective assistance in his
direct appeal. Defendant asserts that
appellate counsel should have raised the
following issues: (1) the trial court
improperly held a "telephonic voir dire" of
Dr. Brown; (2) the trial court erred by
refusing to allow defendant to question Dr.
Brown during the "telephonic voir dire", (3)
the trial court erroneously refused to grant
defendant a continuance to allow him time to
secure Dr. Brown's appearance; and (4) trial
counsel rendered ineffective assistance.
Defendant maintains that "his chances of
succeeding on appeal would have increased" if
the aforementioned issues had been raised.

The PCR court rejected these arguments. The
court noted that at trial, defendant had not
been denied the opportunity to present any
testimony that would have been favorable to
him. The court pointed out that defendant had
not demonstrated that he was prejudiced by the
trial court's "careful consideration of
[defendant's] attempt to call and expert
witness [who was] sympathetic to his position
in this case."

Moreover, defendant was not prejudiced by
appellate counsel's failure to raise claims of
ineffective assistance of counsel on appeal.
Those claims were raised and resolved in the
PCR proceeding. We therefore conclude that the
record fully supports the PCR court's
determination that defendant was not denied
the effective assistance of appellate counsel.

D.L.M., 2015 WL 1980045 at *4-5.

c.   Analysis

Ineffective assistance of appellate counsel is analyzed under

the Strickland standard as well. See Albrecht v. Horn, 485 F.3d

103, 137 (3d Cir. 2007) (quoting United States v. Mannino, 212 F.3d 835, 840 n.4 (3d Cir. 2000)).

The Appellate Division's Opinion is consistent with Supreme Court precedent.d As this Court previously opined when denying Ground One of the instant petition, the record reflects that the trial court made multiple efforts to ensure that Petitioner was able to communicate with his desired witness, Dr. Brown, before eventually determining that her presence would not be beneficial to Petitioner's defense. See supra, Section 3, B 1 c. Further, this Court already observed that pre-trial counsel was not ineffective for failing to subpoena Dr. Brown and Dr. Sheenan. See supra, Section 3, B 3 c. Therefore, appellate counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction. See Buehl v. Vaughn, 166 F.3d 163, 174 (3d Cir. 1999).

Therefore, Ground Four of the petition is denied.

    5.    Ground Five

        a.    The Parties' Arguments

In Ground Five, Petitioner contends he was deprived of his constitutional due process right to a fair trial when the trial court permitted the victim to leave the witness stand to "consult with her father and a member of the prosecutor's office." (Pet., ECF No. 1 at 11.)

Respondents assert that Petitioner has not made a valid due process claim as he has not established that the victim conferred with her father about the case or her testimony during the recess. (Answer, ECF No. 17 at 61.)

b. <u>The State Court Decision</u>

Petitioner raised the instant claim for the first time at oral argument in support of his PCR. (Answer, Ex. Ra 15, ECF No. 17-18 at 32.) The PCR court dismissed the claim as follows-

> Likewise, at the time of oral argument on June 21, 2012, defendant, through counsel, argued that Judge Almeida should not have permitted the child victim to step off the stand while a question defendant raised was addressed. Defendant did not provide a transcript of this occurrence. Nor has he specified why it was improper for the witness to leave the stand during what appears to have been a break. Defendant alleged, without any proof, that the witness was "coached" by the prosecutor's office during the break. His argument fails because it is not substantiated and because he has not demonstrated that Judge Almeida abused his discretion by permitting the witness to take a break. It also fails, however, because it is the type of argument that should have been raised on appeal.

(<u>Id.</u> at 32-33.)

On appeal of the PCR denial, the Appellate Division summarily dismissed this claim as meritless pursuant to R. 2:11-3(e)(2).[4] <u>D.L.M.</u>, 2015 WL 1980045 at *5.

---

[4] This rule authorizes an affirmance when in an appeal of a criminal, quasi-criminal or juvenile matter, the Appellate Division determines that some or all of the arguments made are

c.  <u>Analysis</u>

While being cross-examined, the victim appeared to be confused by a question and asked for clarification. (Answer, Ex. Rta 9, ECF No. 17-37 at 23.) Before she could answer the question, she abruptly asked the court to take a break so she could speak to her father. (<u>Id.</u>) The trial court implored her to respond to the question first, but she insisted that she did not understand the question. The court took a recess and the following colloquy occurred at sidebar:

> THE COURT: What do you, Mr. Morgan, think your obligation now is under the sequestration order in view of the witness saying that she wanted to speak to her father?
>
> MR. MORGAN: I don't think it's a violation of the sequestration order. She didn't say she wanted to talk about her testimony. Her dad just walked in the courtroom.
>
> THE COURT: I know that I saw a gentleman came in and that unnerved her as soon as that person came in. There's been a lot of activity. Did you hear what I just said? There's been a tremendous amount of activity, people walking in while this witness is testifying from the State's – from the State. And the man who just walked in, you could tell, I could see palpably it changed her demeanor on the stand. My question to you is and it's in the backdrop of that I suppose but that's of no material moment, the sequestration order would prohibit a witness from talking to anyone about her testimony while she's testifying.
>
> MR. MORGAN: I agree.

---

without sufficient merit to warrant discussion in a written opinion.

THE COURT: Okay. Do you think you have an obligation to tell the gentleman who just walked in who apparently is her father that he's not allowed to talk to her about the testimony or about the case?

MR. MORGAN: I will and I think I can clarify some of this Judge, Before D.L.[5] took the stand, when you asked me to bring her into the courtroom, she said I want my dad, my dad's not here. He's supposed to be here. Obviously, it was on her mind before she took the stand. He came into the courtroom in the middle of the testimony.

THE COURT: He came into the courtroom literally three minutes ago, 10 after two.

MR. MORGAN: That's when she—

THE COURT: Couldn't he have waited?

MR. MORGAN: No, sir. I didn't even ask the Court for an adjournment at that point. I'm suggesting it was his arrival that probably unnerved her so it could be as benign as I want to go and hug my dad but I will clearly communicate to her and her father.

THE COURT: Do you understand what's going on?

MR. MCGEE: I understand what's going on but, see, the only thing I'm more concerned about Your Honor, is I asked her a question, did somebody prepare you for this.

THE COURT: She said she doesn't understand the question.

MR. MCGEE: I understand that's why you called a recess.

THE COURT: I wasn't going to call a recess if she said I understand the question but I want

---

[5] The Court will refer to the minor victim by her initials.

to talk to my dad, I'm not going to call a
recess. I don't care who the witness is.

MR. MCGEE: I'm not trying to be smart.

THE COURT: I'm not suggesting anything in that
regard. I just don't want any violation of the
sequestration order.

MR. MCGEE: Can I finish?

THE COURT: Go ahead.

MR. MCGEE: The problem is now she goes over,
somebody prepared her for this, whoever
prepared her, it didn't come out.

THE COURT: I can't tell her to understand the
question if she doesn't understand.

MR. MCGEE: That's why I rephrased it.

THE COURT: You can rephrase it.

MR. MCGEE: Are you going to let her talk to
her father?

THE COURT: Yes. That's not a violation of
sequestration order. What's a violation of the
order if she talks to her father and says to
her father, Dad, did I talk to anybody, what
did I say, how should I answer the question,
that's a violation of the order.

MR. MCGEE: You're going to let them go outside
the courtroom?

THE COURT: Yes. They can go wherever they
want. Yes. That's not a violation.

MR. MCGEE: I have no control.

MR. REILLY: The fact the father is in the
courtroom you would want somebody to monitor
the conversation because they might talk about
her testimony.

THE COURT: I think that Mr. Morgan needs to instruct the father and the witness not to talk about it, I know the witness is with— isn't the witness with a member of your unit?

MR. MORGAN: Yeah, a member of the Child Advocacy Center.

THE COURT: Can a member of the Child Advocacy Center be with her at the time she has the discussion with the father?

MR. MORGAN: We'll have someone there, Judge. It seems to be there's a nefarious motive that seems to be being indicated.

THE COURT: No. There's not a nefarious motive. Record will bear this out I suspect. The question was asked on three occasion, there was delay, the delay's not a problem at all, when the father entered probably three questions before this question was asked, the witness's demeanor changed and she had difficulty answering the question and in her answer to the second to last time Mr. McGee asked the question, she said I want a break. You said ask the Judge. I want a break to talk to my father. There's nothing nefarious in that. It's simply the logical conclusion one might reach is I want to talk to my father to deal with this question that I don't know how to answer.

MR. MORGAN: One might reach it.

THE COURT: That's not nefarious. It's a possible scenario by reminding what I think you need to do under sequestration.

MR. MORGAN: I'm more than happy to do it.

THE COURT: Good. Have the child advocacy person there. Okay. See you after the recess.

(Id. at 24-26.)

The court allowed the witness to leave the witness stand during a brief recess.[6] (Id. at 26.) Shortly thereafter the victim returned to the witness stand and resumed her testimony without incident. (Id. at 26-55.)

Generally, a trial court may exclude testimony of witnesses who violate a sequestration order if the defendant is prejudiced by the violation. See United States v. McClain, 469 F.2d 68, 69 (3d Cir. 1972) (citations omitted). Here, the record does not support that the victim discussed her testimony or any facts about the case with her father during the recess. The court's decision to order a representative from the Child Advocacy Center to accompany the victim as she spoke to her father most likely also served to deter any possible violation of the sequestration order. Petitioner has not demonstrated how the state court's ruling was an unreasonable application of clearly established federal law. Therefore, Ground Five of the petition is denied.

IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional

---

[6] The record is silent about whether the witness actually spoke to her father during the recess.

right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

V.   CONCLUSION

In the accompanying Order filed herewith, the Petition for habeas relief under 28 U.S.C. § 2254 is denied.


Dated: <u>October 31, 2019</u>

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**
